Okay, hang on just a second. I've got on my day sheet that this is supposed to be 15 minutes aside rather than 10, if I'm not mistaken. There we go. I'm not sure you need 15, but that's what it says, and that's what you get. May I reserve a minute for rebuttal? Thank you. Your Honor, I would like to address and focus on the Sixth Amendment and the statutory speedy trial issues rather than the due process issue. And with regard to that, Your Honor, I would note, as this Court made clear in United States v. Hall, that in addition to the prosecution, it is the Court's responsibility to safeguard a defendant's right to a speedy trial, even in cases not like this one, where defendant's counsel is willing to accept postponements and continuances. Nonetheless, the Court retains the responsibility for assuring a speedy trial. And the Government, as Aguirre made clear, has a responsibility to act with reasonable diligence in order to provide a speedy trial. In this case, I think the record will show, does show, that the Government systematically undermined the defendant's, this defendant's, right to a speedy trial. And the Court, although it professed itself to be troubled and concerned, nonetheless, eventually abdicated its responsibility to assure that a speedy trial was given. This defendant was before the Court for approximately 23 months, from the time the superseding indictment was unsealed until the time that he ultimately entered his plea of guilty. The reason he was before the Court for that long is because this was essentially an untriable case. It was an indictment that could not possibly have been intended to be tried. It was 196 pages long. The first count, the CCE, had 98 predicate acts and 78 pages of overt acts, probably 700 overt acts. The third count, the money laundering count, had four. Why does that say it can't be tried? Well, because I think it would have been virtually – there were 12 defendants. There were events here beginning in 1975 up to 2006. The case would have taken months, if not years, to try. Well, let's not get so hyperbolic, counsel. I mean, I've tried cases that ran 12 months in civil cases, and they were complicated. Your Honor, I – They are unusual, but they're not untriable. And in the Central District of California, we get multiple defendant cases, drug cases, all the time, and they are very, very difficult to manage. But I'm not aware that those cases are untriable. So I guess I don't know – understand what your point is. If we're supposed to infer from the complexity of the case that your client is being denied his Sixth Amendment rights per se, then I'm not sure where the argument goes. I'm not suggesting, Your Honor, that the complexity in and of itself per se resulted in a speedy trial violation. I'm suggesting that I don't believe the case was ever intended to be tried, and the government's conduct demonstrated that. And that's the essence of our argument. Well, that would be a factual inquiry for the district court to make. How can we decide what the government's intent is? Well, Your Honor, I think that there are factual developments in this case, and I want to focus on one particular period, and that is between October of 2007 and April 1 of 2008, a period of at least six months in which the record establishes sufficiently for this court to judge that the prosecution acted in such ways as to interfere with the ability of the defendant to obtain a speedy trial. We have the original indictment in June of 2006, which is unsealed in September of 2006. In late May of 2007, there was a superseding indictment.  And it was up until that point, let us assume, that things were proceeding in an appropriate pace, consistent with the defendant's right to and ability to obtain a speedy trial. As various defendants quit out, new developments began to appear. And between October of 2007 and April of 2008, when basically there remained three defendants before the court, that is Defendant Gregory Sparrow, Defendant Larry Weitzman, who was Mr. Sparrow's business lawyer and who was brought into the case in the first superseding indictment, and a gentleman named Kaiser. At that point, the first thing that we need to look at is the government's approach to the issue of discovery. Throughout the case, the government had been providing discovery in small batches, not so small, thousands of pages at a time, sufficiently so that on December 12, 2007, the court expressed its concern with the way in which the case was being handled, the fact that the discovery was being parceled out so slowly. And the fact that it appeared that what the government was essentially doing was delaying the case so that it could get plea agreements from various defendants, which, in fact, was exactly what was going on, as it was in Hall. Right. I acknowledged or saw that Judge Wendell was concerned about that. What did he do with respect to the discovery management? What did he do? Yes. He simply told the government that the government could not, should not be conducting the case in that way and ought not to be doling out discovery in small batches like that. After the government — after the court gave the government that admonition on December 12, there were six additional discovery releases, totaling 22,000 pages. Not one of those pages, to our review, was obtained by the government after August of 2006. Or September, rather, of 2006. September of 2006, there were searches at the home of Mr. Stura's parents and at the home of Mr. — and office of Mr. Weitzman. The government was turning over documents in June of 2008 that it had obtained in September of 2006. The superseding indictment in 2007 had in it only a handful of additional acts, all of which occurred before June of 2006. So the first thing that the government did was to continue to dole out discovery in batches and small doses, and each time with a predictable result that somebody would say, okay, we need more time now because we've had new discovery. The second thing that the government did was to suggest explicitly in October of 2007 that it intended to supersede the indictment and that its intent was to sever Mr. Kaiser from Mr. Weitzman and Mr. Sparrow and to do what actually seems quite reasonable and almost necessary on this record, to transfer the Sparrow and Weitzman case to the Eastern District of California. Because, in fact, virtually nothing, nothing in the indictment against Mr. Sparrow and Mr. Weitzman had anything to do with the State of Idaho. So what the government did was to suggest that that's what it was going to do, it was going to try to do that in November grand jury, but probably not until the December grand jury. The defense, therefore, stopped its preparation and waited, as defense counsel told the court after the fact, but also at the time. If the government's going to supersede, of course we'll wait. The government did not supersede in the anticipated manner and did not go to the December grand jury, but instead went to the grand jury in January of 2008 and did two things. One thing it did was to supersede in Idaho with allegations that were based on the exact same things that had been in the previous indictment with the addition of a few telephone calls about financial transactions, all of which calls happened before June of 2006 and all of which had been overheard in the jail by definition before June of 2006, and the addition of one letter dated August of 2006, which had apparently been obtained in the searches of September 2006. Fifteen, sixteen months later, we get a superseding indictment with these new allegations, but only these new allegations, but now we have a new superseding indictment. But contrary to the promise of the court and contrary to the promise that had kept the defendants from doing anything in the case for three months, it was the exact same indictment with a few small additions. Well, it named an additional defendant, too, didn't it? No, it didn't name an additional defendant. Mr. Hammons? Yes. No. That's the fourth point, Your Honor, and thank you for bringing it up, because here's what happened with Mr. Hammons. Mr. Hammons was one of the original 12 defendants in this massive CCE case. He lived in the state of Oregon, and he had obtained a false passport, which somehow the passport office was in New Hampshire. So he was arrested in September of 2006 at the same time as this indictment was in existence, and there was a warrant out for him for this indictment. He was transferred to New Hampshire, and what the government in Idaho did was to put a detainer on him, as Judge Wynn Mill noted in his decision at page 11 of the excerpt. They put a detainer. What does a detainer mean? A detainer is a hold. When you're done with this man, send him to us. So the government was perfectly content to let this man go to New Hampshire, even though he was one of the defendants, one of the initial defendants of this CCE. Okay. The government made no effort to get him from Idaho, even though predicate act number 96 in the original indictment is Mr. Hammons' application for that passport. It is a predicate act in the CCE, but the government allowed him to go to New Hampshire to sit there for more than a year, apparently with no effort to bring him back. Okay. At some point, his lawyer in New Hampshire made a logical move. He said, shouldn't this case be transferred to Oregon, where everything, where he lives, where all the witnesses are, where he sent the application from? And the court agreed and the government agreed. The government in New Hampshire, which had to know that he was wanted also in the CCE, said nothing about, no, no, no, let's send him to Idaho. And apparently the government in Idaho didn't say anything about, wait a minute, before you send him back to Oregon, send him to us. You've got to go over Idaho to get to Oregon. But they allowed him to go to Oregon. This was not a transfer made by his lawyer. His lawyer has no power to make transfers. It was a Rule 21 motion for discretionary change of venue. And it was granted. At this point, he was still in original indictment. He was in the first superseding indictment. But the court, the government, rather, during the October colloquies, stood before the court and said, there are only three defendants who have not yet pled, not even mentioning Hammonds. They said, they spelled it out. They said, we're working on a deal with Jones. But we have Kaiser, Sparrow, and Weitzman still before the court. They haven't pled. Not a word about Hammonds. Not a word to anyone about Hammonds. But all of a sudden, in the January 2008 indictment, we had Mr. Hammonds being brought in to face this charge, the New Hampshire charge, as a predicate act to the CCE. All of a sudden, Hammonds before the court. The same thing happened with Forrest MacDonald. Forrest MacDonald is the son of Gerald MacDonald. He was brought in in the first superseding indictment. All of a sudden, we need new time. Forrest MacDonald first comes before the court on October 1st of 2007. Hammonds first comes before the court in February of 2008. Well, what you're arguing is that the government misconduct and the trial judge, specifically, who handled the whole case, found no government misconduct. And do we not have to show deference to that ruling? Misconduct is a stronger word than I would ask the court to adopt. I would say that the prosecution failed to honor the defendant's right to a speedy trial and that the government took steps to postpone the trial for the purpose of getting negotiated pleas and for the purpose of forcing defendants to plead and to avoid trial. What's wrong with that? What's wrong? Yeah. Well, I think if the court reads United States v. Hall, the court will see that it is not appropriate. It is not a reasonable cause for delay to allow the government extra time to get plea negotiations from some defendants so that they can use those defendants as witnesses against others. That's not a reasonable cause for delay. It's still within the calculated speedy trial time if you consider all the excluded periods, right? Absolutely. And that's why I'm focusing on October to April, because in that period of time there was not a single reasonable cause for delay. And that period of more than six months contributed both to the two-year period, which is presumptively prejudicial under the Sixth Amendment, and it gives a 120-day – I'm sorry, 180-day period, well over the 70, in which there was no good cause for delay. There was no 3161H7 cause available. The judge did make that finding, but the judge – Why don't we do this? Your time has expired. The speedy argument time has expired. We'll give – we'll hear from the government and we'll give you a chance to respond. Thank you, Your Honor. Thank you very much. Thank you. May it please the Court. Counsel to the defense. My name is Monty Stiles. I'm an assistant United States attorney from the District of Idaho. I, as a prosecutor in this case, want to trial counsel with Mr. Tony Hall. Because counsel addressed the speedy trial issue first and only that, I'll go straight to that. The issue of speedy trial in this case is they make two claims, one a constitutional one and one a Speedy Trial Act claim. Under the constitutional speedy trial, the Barker v. Wingo case, you can assume that there's assumed prejudice in the case because it did take a while to get to trial. We concede that. But all three other Barker v. Wingo points favor the government in that the length of the delay was caused by the complexity of the case, multiple defendants filing multiple motions to continue. Counsel's argument today and in his brief seems to rely primarily on inferences of his motives, of his thoughts of what the motives of the government were. As the Court pointed out, Judge Windmill, who presided over the entire trial, had all of the facts in front of him, deemed none of that to be true. Whatever evil motives the defendant attributed to the government, Judge Windmill didn't buy it. He found there was none of that. And, of course, this Court, under a clear error standard, has to determine whether the Court made clear error in its factual findings, which it did not. Judge Windmill very carefully reviewed the primary argument made in the defendant's brief, that the government delayed Hammons' coming to Idaho. He made specific findings about that, how Mr. Hammons went to New Hampshire, how Mr. Hammons' attorney got him transferred to Oregon. This caused huge delays. We continued our case with the other 14 or 16 defendants, including Mr. Sparrow. Along the way, multiple defendants, all but the last three, pled guilty. All of them cooperated, with the exception of Mr. Hammons. All of them provided information about co-conspirators. This expanded the knowledge of the government regarding the relationship between the co-conspirators. And, finally, what it boiled down to is that the cumulative weight of the evidence when the defendant was offered an opportunity to go to trial in June 2008, he declined to do so. Having been granted a severance by Judge Windmill from Mr. Weitzman, because of Mr. Weitzman's ongoing health issues, Mr. Sparrow withdrew his motion to sever, claiming he now wanted a trial with Mr. Weitzman, even though it could be delayed months and months and months later. That fact alone, Your Honors, I believe shows Mr. Sparrow's true intent, which is not to go to trial and not be brought to justice in these charges, but to delay things until it couldn't be delayed further. The other thing that shows his delay and his unwillingness to go to trial is the record shows there was a constant discussion throughout the case about getting pretrial motions filed by the defendants. Mr. Sparrow and Mr. Weitzman in particular had this idea about venue that they argued for months and months. Oh, we're going to file these motions. We're going to file these motions. Venue's not proper. What got down to the hearing on May 27th, 2008, after months of delay of no filing of motions until April 1st, 2008, that they conceded that venue was not a dispositive issue and that it would be decided at trial. And so one issue that they delayed and delayed and delayed, the filing of the pretrial motions, they conceded was in error and they basically took the position of the government at that time, which was venue was not a dispositive motion. That kind of thinking, that kind of processing analysis along the way, and their analysis of the evidence that was provided to them caused constant delays in the case, as well as the ongoing negotiations with defendants, which naturally in any complex case results in more evidence against the defendants. Ultimately, that evidence caused both Mr. Sparrow and Mr. Weitzman and Mr. Hammons to plead guilty to charges and they were sentenced. On the statutory speedy trial analysis, Your Honors, we put in our brief page after page after page of relevant and overlapping time periods in which their excludable time was found and cited the relevant time periods that cover the time period covered by counsel. The time period between October 2007 and April 1st, 2004, 2008, is covered by a period of time in which the trial was first set in late 2007 and then moved to January 2nd, 2008 at the request of co-defendants. Mr. Sparrow never objected, never moved to sever, never complained about speedy trial. In fact, acquiesced in all of these continuances, which resulted in December of 2007, his counsel saying because of the complexity of the case, more than a year after his arraignment, because of the complexity of the case, counsel's own trial schedule and his need to file pretrial motions, he couldn't conceive of a trial before March of 2008. Mr. Sparrow's own counsel argued that he couldn't be ready, Mr. Sparrow couldn't be ready until March of 2008. Even with that, and even with Judge Windmill's concerns that there was a lot of discovery in this 30-year case, which I totally admit there was, it was overwhelming to us also. 30 years of criminal history is a lot to document and get ready for trial. Even with the court's frustrations, the court said you guys are all going to trial January 2nd. I'm holding your feet to the fire. I'm not going to wait for this to go on any longer. I'm taking control of this. You guys are all getting ready for trial. He said that to me. He said it to defense counsel. Everybody knew that was his position. What happens? Counsel for Mr. Sparrow, counsel for Mr. Weitzman, counsel for Mr. Kaiser, they're all asking for more time. Oh, Judge, we've got to have more time. This is very complex. We've got to file pretrial motions. Even then, when they had the opportunity to go to trial January 2nd, Mr. Sparrow didn't file any of his dispositive pretrial motions until April 1st, 2008. This was a year and a half, 20 months or so after he was arraigned. And all of those motions, many of those motions had been discussed for much of the time and had never been filed. We couldn't proceed to trial when they were constantly claiming they were going to file dispositive pretrial motions. It made no sense to proceed to trial. It made no sense for Mr. Sparrow to file motions with only a month before trial, and then we argued them in an evidentiary hearing, and Mr. Sparrow moved to reconsider, and that put us into June. And even then, he wasn't ready to go to trial because he asked for his one successful motion, motion to sever from Mr. Weitzman because of prejudice, to be withdrawn so that he could go to trial with Mr. Weitzman many, many months later. And at that time, we didn't know when Mr. Weitzman was going to trial because he had been suffering from cancer and was being treated. So it could have been 6 months, 12 months later. Mr. Sparrow wasn't concerned about that at the time. All of this talk about discovery abuses, there was never a motion to compel discovery in this case. In fact, the record on the hearing of December 12th, December, the December 2007 hearing, Mr. Feiner says, oh, no, Judge, everybody's cooperating. We're doing fine on this. We can't see a trial until the spring. It wasn't an issue at the time. It was just the way it was. A complex case. Defendants have been involved in crime for decades. Defendants who have been convicted in Mr. Sparrow's case four previous occasions, been sent to prison four previous times, and continued to commit crimes with his co-defendant attorney, even while serving his fourth prison term. In my estimation, the government's ability, the agent's ability to ferret out that long period of criminal history, put it all together and show that Mr. Sparrow was unwilling to stop his criminal activity, even in the face of his fourth federal conviction, was remarkable. And even though, excuse me. I appreciate your accounting of all this. At the December 12, 2000 hearing, Judge Windmill voiced some of the concerns that counsel raised. And he says, I think we spend far too much time worrying about plea negotiations and not enough time getting ready for trial. I think that's what has captured this case and taken control of it. He later on says, plea negotiations have driven this case instead of getting the case ready for trial. And that's exactly what I'm saying. You know, you agreed with him that the so pushing it off on the defendants, I don't think they have their responsibility for your strategy of taking plea agreements. Judge, I think Judge Windmill's frustration at that point was understandable. It was not his frustrations was not based upon anything in particular. It was just generalized frustrations about what he perceived in a short status conference hearing. Well, he says, I take full responsibility for not managing the case better from the get-go. I should have done so and just taken control. I should have. It's my shortcoming in not tracking the case as carefully as they should. We've got some serious speedy trials then because we don't have a trial date for them separately. So we'll take a look at that and see what we can do to clean up this mess. That's more than a little bit of frustration on one status conference. That's a reflection, it seems to me, on the course of conduct of the pretrial up to that point. I think the frustration felt by the court was felt by all of us, including counsel for the defendants in this case, Your Honor. And as noted later in that transcript, the judge did take control of it and said he was holding everyone's feet to the fire for January 2nd date, which was continued again at the request of the defendants. Right. But then he goes on at the end. He says, I see no other way of going forward to a meaningful and timely resolution of this case unless the court just holds everyone's feet to the fire, because otherwise we'll just see again the ongoing late or not late, but the ongoing and continuing disclosure of evidence produced by the government and the threat of superseding indictments and the ongoing processing of pleas instead of getting this case ready for trial. Well, that sounds like the court is focused on the government, not on the defendants. The court understandably focused its frustration on the government at that point. But the order from which the defendant appeals that record, the motion to dismiss based upon speedy trial, focuses on nothing like that. The focus of their motion and the court's decision was based almost primarily on Mr. Hammond's. The court made specific findings about that and the defendant appealed. I take full responsibility for the complexity of the discovery in this matter. The record is full of evidence that shows the government provided all of this evidence to the defendants through an open file policy, and there is nothing in the record that suggests the government did not provide the complexity of this evidence even though it may have been bait-stamped and provided along the way as we're proceeding to trial. The record also shows the government took extraordinary steps in helping the defendants understand this complex evidence by providing them, in my opinion, my experience, unprecedented 400-page bill of particulars. It was an informal bill of particulars, which was an informal summary of every bit of evidence in timeline fashion which recited to every report that it came from. We gave that work product to the defense to give them an idea of not only our theories but the putting the case together for them. This simply wasn't a big deal at the time, Your Honor. Although Judge Windmill did express frustration, it's not the only time he's ever expressed that frustration to me. But in this case, because of the number of defendants involved and the length of period involved, that wasn't what the case was decided about and not why we're on appeal. We're on appeal because Mr. Sparrow claimed the government improperly delayed Mr. Hammond's appearance in Idaho, which the court found was there's no evidence of that. Again, on the statutory speedy trial part of things, we set out the various things that show that the court made those findings in each instance and was scrupulous about that. And again, in the end, when the defendant was granted the right to go to trial, he showed his true colors in that he didn't want a trial then. Kind of hard to understand, but nonetheless, that's what the record shows. I'm certainly happy for Judge Windmill that he didn't have to try this case. Yes. But was it triable? Your Honor, we were obligated under our sworn oath to take cases that are only that we can prove beyond a reasonable doubt. Mr. Sparrow, charged with the CCE, had four prior felony convictions at that point, which under CCE law are admittable as the convictions themselves without even proving the underlying crime. We had to prove a continuing series of crimes with five or more people and substantial income, and we were prepared to do that on Mr. Sparrow. The fact that he continued to commit crimes while he was in prison with his attorney at the time was his choice. We were able to find that out and continue to gather evidence that after his fourth conviction he was doing that. In fact, what that came down to is some of the most powerful evidence against him and Mr. Weitzman in the whole case was their own phone calls while he's in prison talking about moving his millions of dollars around. It became the most powerful evidence in the case, and that all occurred after he was incarcerated in 2005. Well, and I don't find it very unusual for the government to continue disclosure during the case. I mean, and sometimes the remedy of the trial judge is to say, well, you're too late now. You are now late. I'm not going to allow any of that, right? Just force you to trial. The court never did that. There was never a motion to compel discovery. There was never a motion to dismiss for violation of Brady or Jenks Act. It was all coming in. We were basically providing all of this stuff to them, organizing it, bait-stamping it, stuff that they had access to the entire case. There's nothing in the record that shows we were dilatory in our discovery other than the frustration Judge Windmill understandably showed at the end of a long case when the primary defendant, Kent Jones, was just deciding to plead guilty and we were left with three additional defendants. Okay. Thank you. Thank you. Mr. Weinberg. I'll try to talk very quickly. Let's start with giving you two minutes and we'll see what happens. First, I'm not suggesting evil intent. I'm only suggesting an attempt to obtain tactical advantage. With regard to the judge's findings, the defense asked for an evidentiary hearing and it was denied. Judge Windmill made factual findings based on an incomplete record, which factual findings were demonstrably wrong. The finding that the problem with Hammonds caused a lot of delay because defense counsel mistakenly had him moved to Oregon is just based on nothing. It's wrong as a matter of judicial notice almost. You know that a defense lawyer can't move a case by him or herself. What happened here was Rule 21. It was on a defendant with a detainer. It was on a case in Idaho and New Hampshire that the Idaho authorities knew about. They knew exactly where the man was. There is absolutely not a shred of evidence to support the idea that the Rule 21 motion had any impact whatsoever on Mr. Hammonds' availability. And, in fact, when the government came up with a superseding second, superseding indictment in January of 2008, they had apparently had enough contact with New Hampshire prior to that to know that they could now try Hammonds in Idaho on the New Hampshire charge. They had secured that agreement sometime before January of 2008. It caused no delay, and Judge Windmill was, with all respect, clearly in error in making that finding. With regard to the complexity, yes, the case was complex, but it was not the complexity inherent. It was the fact that it was a moving target, as Mr. Gordon, Sparrow's lawyer below, correctly noted. It kept changing. When several defendants pled and others wouldn't, new indictment comes down. And what's the new indictment? Three new defendants, Forrest McDonald, son of Gerald, who didn't want to plead. All of a sudden his son is indicted. Larry Weitzman. Okay, your two minutes are up. If you want to just have a wind-up paragraph or two. All right, let me wind up. The filing of the motions. We're talking about a period from October to April. The government says they didn't file motions until April 1. That's because the government was telling them they were going to get severed and sent to California, which is what they wanted. There were no motions to be made. Then all of a sudden we get a new indictment, a new person in the case, Hammonds, and he's not even brought to court until February. They make their motions on April 1 at the earliest opportunity. They make the speedy trial motion at that point. The motion covers all time up to April 1. It was wrongfully denied, and Defendant Sparrow was completely within his rights to say, with this wrong ruling, I'm going to enter guilty plea and preserve this issue on which the defense was clearly correct. Thank you, Your Honors. Thank you. Thank you.    Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.    Thank you, Mr. Chiu, for your arguments. United States v. Sparrow now submitted for decision. The last case in our argument calendar this morning, United States v. and I may or may not pronounce it correctly, Goetjes v. Moolah. We'll just wait for everybody to set up. We'll just wait for everyone to set up.
judges: Bury, Fletcher W. , Fisher